**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

JENNIFER CONNORS, ROBERT
CONNORS, DAWN BORQUE
ROCHETTE,

                          **Plaintiffs,**

-vs-                                              Case No.  6:05-cv-647-Orl-31KRS

WEST ORANGE HEALTHCARE
DISTRICT, d/b/a Health Central,

                          **Defendant.**
_____

# ORDER

In this case, the Plaintiffs assert that the Defendant discriminated against them by failing to

provide a sign language interpreter during the course of medical care.  This matter comes before

the Court on the Defendant, West Orange Healthcare District d/b/a Health Central's ("Defendant")

Motion to Dismiss (Doc. 9) and the Plaintiffs' Response thereto (Doc. 11).[1]

**I.     Background**

    A. The Parties

    Jennifer Connors ("Connors") and her husband, Robert Connors, are residents of Ocoee,

Florida, and Dawn Borque Rochette ("Rochette") (collectively referred to along with Connors and

Robert Connors, where appropriate, as the "Plaintiffs") is a resident of Maitland, Florida.  The

Plaintiffs are profoundly deaf, and therefore are "qualified individuals" within the meaning of the

_____

[1] The Plaintiffs' Complaint appears at Doc. 1.

Americans with Disabilities Act, 42 U.S.C. section 12101, *et seq*. ("ADA") and section 504 of the

Rehabilitation Act, 29 U.S.C. section 794 ("Section 504" or the "Rehabilitation Act").  The

Plaintiffs communicate in American Sign Language.

 The Defendant is an independent special district under Chapter 189 of the Florida Statutes,

and is considered a "public entity" within the meaning of 42 U.S.C. section 12131.

 B. Facts

 *1. Connors*

 On July 14, 2004, Connors and her husband went to the Defendant's emergency room,

where Connors complained of vaginal bleeding.  (Doc. 1 at 3; Doc. 9 at 4).  Upon arrival, Connors

advised the Defendant's employee working at the registration desk that Connors needed a sign

language interpreter, and gave that employee a telephone number for an interpreting service.  (Doc.

1 at 3).  Connors also advised that employee that she had previously called the interpreter to

request that the interpreter meet her at the emergency room to assist her in communicating about

her medical condition.  (*Id*. at 3-4).  The Defendant's employee told Connors that she did not need

an interpreter, and that she would be able to communicate through writing.  (*Id*. at 4).  Connors

became upset, and gave the Defendant's emergency room staff a copy of the Department of Justice

Guidelines for communicating in hospital settings with individuals that are deaf or hard of hearing.

(*Id*.).  The defendant's emergency room staff "laughed at Connors and said no."  (*Id*.).

 Some time thereafter, the interpreter Connors had called arrived at the emergency room.

(*Id*.).  One of the Defendant's employees spoke with a supervisor, who advised Connors that she

would have to pay for her own interpreter.  (*Id*.).  Connors again referred to the Department of

Justice Guidelines, but the Defendant's employees gave the Guidelines back to Connors and

demanded that the interpreter leave the hospital.  (*Id*.).  Connors was then brought to an examining room, where she again requested an interpreter.  (*Id*.).  The Defendant's employees ignored that request, and advised her that the doctor would use paper to communicate with her.  (*Id*.).  Another nurse then entered the examining room, and asked if Connors needed an interpreter.  (*Id*.). Connors said that she did.  (*Id*.).

Approximately one and one half hours later, a nurse entered the examining room and asked Connors for the Department of Justice Guidelines.  (*Id*.).  Three hours after that, the Defendant's employees returned the Guidelines to Connors, but did not treat her bleeding at that time.  (*Id*.).

Subsequently, the Defendant's employees performed a pelvic examination on Connors, but did not communicate with her during that examination.  (*Id*. at 5).  Connors allowed the examination, despite the fact that she did not understand what was happening, because she felt it was an emergency.  (*Id*. at 4).  During the examination, Connors was unable to understand what the doctor said to the nurse.  (*Id*. at 5).  The doctor wrote the word, "endometriosis" on a piece of paper, and then left the examination room.  (*Id*.).  Connors did not know what that word meant, but was unable to question the doctor.  (*Id*.).  Approximately ten minutes later, a nurse came into the examination room, crossed out "endometriosis," and said that it was an error.  (*Id*.).  Connors "attempted to ask if her blood was normal, and the nurse said yes."  (*Id*.).  The nurse told Connors that she was "OK" despite the bleeding, and advised her to go home.  (*Id*.).  Connors was not told how to treat or handle the clotting and bleeding from which she was suffering.  (*Id*.).  Robert Connors also attempted to ascertain what was wrong with Connors, but he was unable to communicate with the Defendant's employees.  (*Id*.).

*2. Rochette*

Rochette visited the Defendant on November 6, 2004, because she had suffered a sprain of the large toe on her right foot.  (*Id*. at 5).  Upon admission, Rochette requested an interpreter because she cannot adequately understand complex written English.  (*Id*.).  The Defendant's employees refused to provide Rochette with an interpreter.  (*Id*. at 6).  As a result, Rochette was unable to understand the nature of the treatment she received, the medical consent forms she was given, or what follow-up treatment was required.  (*Id*.).

*3. Common allegations*

Because Connors and Rochette were unable to effectively communicate with the Defendant's employees, neither of them understood the treatment provided or the procedures performed.  (*Id*.).  Connors and Rochette were unable to ask questions or voice their concerns regarding the risks and benefits of the procedures and treatments recommended by the Defendant's employees.  (*Id*.).

In addition, Connors and Rochette were required to sign consent forms, as well as other forms, before they could receive medical treatment.  (*Id*.).  However, neither of them had the assistance of an interpreter when reading and signing these forms, and although they both signed the forms, neither of them fully understood to what it was they were consenting or what treatment would be performed.[2]  (*Id*.).  The Defendant's employees did not discuss the risks and benefits of the treatments, and as a result, Connors and Rochette were unable to weigh possible choices

_____

[2] In contrast to Rochette's allegations, Connors has not alleged that she is unable to understand written English.

between procedures.  (*Id*.).  Instead, they signed the forms because they were afraid for their health and safety, and because they did not feel that they had any other options.  (*Id*. at 6-7).

C. Claims and Arguments

In Count 1, the Plaintiffs assert that the Defendant violated Title II of the ADA, 42 U.S.C. section 12131, *et seq.* ("Title II"), by: (1) failing to maintain policies and procedures to ensure compliance with the ADA; (2) failing to ensure that communications with the Plaintiffs were as effective as communications with non-disabled patients; (3) failing to provide auxiliary aids and services; (4) failing to provide notice of the Plaintiffs' rights; and (5) excluding the Plaintiffs from, and denying them the benefits of, services due to their disability.  As a result, the Plaintiffs seek several remedies, including a declaratory judgment stating that the Defendant's polices and practices subjected the Plaintiffs to discrimination in violation of Title II, injunctive relief, and compensatory damages.

In Count 2, the Plaintiffs assert that the Defendant violated Section 504 of the Rehabilitation Act, in that the Defendant's policies and practices discriminated against the Plaintiffs on the basis of their disability, the Defendant denied the Plaintiffs services that were available to non-disabled individuals, and the Defendant refused to accommodate the Plaintiffs with appropriate auxiliary aids and services.  Thus, the Plaintiffs seek a declaratory judgment stating that the Defendant's practices and policies subjected the Plaintiffs to discrimination in violation of Section 504, injunctive relief, and compensatory and punitive damages.

The Defendant has moved to dismiss the Complaint on several grounds.  First, the Defendant asserts that Robert Connors has failed to state a claim upon which relief may be granted because he was not a patient and does not allege that he received disparate treatment as a result of

his disability.  Second, the Defendant asserts that Connors communicated with the Defendant's

employees both verbally and in writing and that Connors was not denied any services or benefits

as a result of her disability, and thus the Defendant argues that Connors has not established a

violation of the ADA.[3]  Third, the Defendant argues that, as to Rochette, the Complaint does not

establish a violation of the ADA because she was able to communicate with the Defendant's staff,

auxiliary aids and services were provided to her, and she does not allege that she was denied any

services or benefits as a result of her disability.[4]  Finally, the Defendant argues that the Plaintiffs

are not entitled to injunctive relief under either the ADA or the Rehabilitation Act because they

have failed to establish both an injury in fact and a likelihood of future injury.

## II.       Standard of Review

        In ruling on a motion to dismiss, this Court must view the complaint in the light most

favorable to the Plaintiff.  *Scheuer v. Rhodes*, 416 U.S. 232 (1974), and must limit its

consideration to the pleadings and any exhibits attached thereto.  FED. R. CIV. P. 10(c); *see also*

*GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993).  The Court will liberally

construe the complaint's allegations in the Plaintiff's favor, *Jenkins v. McKeithen*, 395 U.S. 411,

421 (1969), and will not dismiss a complaint for failure to state a claim unless it appears beyond a

doubt that the Plaintiff cannot prove any set of facts that support a claim for relief.  *Conley v.*

*Gibson*, 355 U.S. 41, 45-46 (1957).  In ruling on a motion to dismiss, "conclusory allegations,

---

        [3] The Defendant asserts that "[d]iscrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases."  Thus, although the Defendant then couches certain arguments solely in terms of the ADA, the Court presumes that the Defendant intended such arguments to apply to claims under the Rehabilitation Act, as well.

        [4] *See* the discussion in note 3, *supra*.

unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In reviewing a complaint on a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), the rule to be applied is that, "courts must be mindful that the Federal Rules [of Civil Procedure] require only that the complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief." *U.S. v. Baxter Intern., Inc.*, 345 F.3d 866, 880 (11th Cir. 2003) (*citing* FED. R. CIV. P. 8(a)).  This is a liberal pleading requirement, one that does not require a plaintiff to plead with particularity every element of a cause of action.  *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001).  Instead, the complaint need only "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Id.* (internal citation and quotation omitted). "A complaint need not specify in detail the precise theory giving rise to recovery. All that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests." *Sams v. United Food and Comm'l Workers Int'l Union*, 866 F.2d 1380, 1384 (11th Cir. 1989).

**III.   Legal Analysis**

A. Injunctive Relief

To obtain injunctive relief, a plaintiff must allege four things: first, that she has suffered an injury-in-fact; second, the existence of a "causal connection between the asserted injury-in-fact and the challenged action of the defendant;" third, that the injury will be redressed by a favorable decision; and, fourth, "a real and immediate -- as opposed to a merely conjectural or hypothetical -- threat of *future* injury." *Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001) (emphasis in

original) (in ADA cases, a plaintiff lacks standing to pursue injunctive relief unless she "alleges facts giving rise to an inference that he will suffer future discrimination by the defendant.") (internal citations and quotations omitted); *see also Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) ("Allegations of possible future injury do not satisfy the requirements of Art. III.  A threatened injury must be 'certainly impending' to constitute injury in fact.") (internal citation and quotation omitted); *Johnson v. Bd. of Regents of the Univ. of Ga.*, 263 F.3d 1234, 1265 (11th Cir. 2001) ("to have standing to obtain forward-looking relief, a plaintiff must show a sufficient likelihood that [she] will be affected by the allegedly unlawful conduct in the future").

The Plaintiffs' only allegation regarding future injury reads, in its entirety, "Plaintiffs live in the vicinity of Defendant, and must return to the Defendant in the near future if an emergency exists. Because of their prior experience at Defendant, they are less likely to request medical care when such desperate need exists."  (Doc. 1 at 8).  This allegation is not sufficient to establish a real and immediate threat of future harm.  The Plaintiffs have not alleged that they anticipate returning to receive treatment from the Defendant at any point, whether for ongoing treatment related to their original visits or for some unrelated medical issue.  Instead, they base their allegation on the entirely speculative potential of a future medical emergency, and have not alleged that such future medical conditions are likely to, or may possibly, arise.  Because the Plaintiffs have not established a likelihood of returning to receive treatment from the Defendant, they have not established that they will likely suffer from discrimination at the Defendant's hands in the future and, accordingly, lack standing to pursue injunctive relief.  *See Shotz*, 256 F.3d at 1082 (where complaint only alleged past incidents of discrimination, and did not allege that plaintiffs either attempted to return to defendant's facility or intended to return in the future, plaintiff failed to allege real and

immediate threat of future discrimination); *Access Now, Inc. v. S. Fla. Stadium Corp.*, 161 F.

Supp. 2d 1357 (S.D. Fla. 2001) ("Absent an allegation that he intends to return to the public

accommodation, an ADA plaintiff fails to demonstrate this "irreducible minimum" and thus lacks

standing to sue for injunctive relief."); *Atakpa v. Perimeter OB-GYN Assocs.*, P.C., 912 F. Supp.

1566, 1573-74 (N.D. Ga. 1994) (plaintiff lacked standing under ADA and Rehabilitation Act

where she failed to allege likelihood that she would use defendant as health care provider in the

future and that if she did that they would discriminate against her).[5]

---

[5] *See also Freydel v. N.Y. Hosp.*, 242 F.3d 365 (2nd Cir. 2000) (plaintiff lacked standing because, *inter alia*, fact that she "may" be referred to hospital in the future was only an "indefinite speculation") (unpublished opinion); *Constance v. State Univ. of N.Y. Health Sci. Cent. at Syracuse*, 166 F. Supp. 2d 663, 667 (N.D.N.Y. 2001) (plaintiffs' assertion that they would likely return to hospital for treatment was conclusory, and at most showed only a possibility of a return visit, not a likelihood); *Proctor v. Prince George's Hosp. Cent.*, 32 F. Supp. 2d 830, 832-33 (D. Md. 1998) (plaintiff lacked standing for injunctive relief where he did not suggest likelihood of returning to hospital in the future, and any such assertion would necessarily involve speculation); *Schroedel v. N.Y. Univ. Med. Cent.*, 885 F. Supp. 594, 599 (S.D.N.Y. 1995) (plaintiff failed to establish immediate threat of "repeated injury;" court declined to infer that: (1) plaintiff would experience medical condition in the future that would require assistance; (2) plaintiff would decide to utilize services of defendant; and (3) defendant would again discriminate against her by failing to provide effective means of communication); *Aikins v. St. Helena Hosp.*, 843 F. Supp. 1329, 1334 (N.D. Cal. 1994) (dismissing claim for failure to establish likelihood that plaintiff would be served by defendant in the future). The cases the Plaintiffs cite are not to the contrary, because in those cases, where the court found standing for the plaintiff to pursue injunctive relief, the plaintiffs alleged that they were likely to visit the defendant facility in the future and thus that they would be subject to future discrimination. *See Gillespie v. Dimensions Health Corp.*, 2005 WL 1147830 at 4 (D. Md. May 16, 2005) (plaintiffs alleged that they would likely continue to seek medical treatment from defendant for themselves and for their family members, and that they would likely continue to be injured by the defendant's policies and practices); *Access Now*, 161 F. Supp. 2d at 1364-65 (plaintiff alleged that he was likely to be subjected to continuing discrimination by the Defendants in the future, and testified that he would return to defendant's facility if barriers were removed). *See also Majocha v. Turner*, 166 F. Supp. 2d 316, 325 (W.D. Pa. 2001) (plaintiffs averred that they would like their child to be treated by defendant in the future for an infection that was likely to recur, but that they were prevented from doing so because of defendant's method for dealing with hearing impaired parents, and that defendant intended to continue that practice).

B. Damages Under Title II of the ADA and the Rehabilitation Act

Although the Court has determined that the Plaintiffs lack standing to pursue injunctive relief, the inquiry does not end there, because the Plaintiffs have also asserted claims for damages under both the Rehabilitation Act and Title II.  Compensatory damages are available in actions pursuant to the Rehabilitation Act upon a showing of intentional discrimination.  *Wood v. President and Trs. of Spring Hill Coll. in City of Mobile*, 978 F.2d 1214, 1219-20 (11th Cir. 1992); *Whitehead v. Sch. Bd. for Hillsborough County, Fla.*, 918 F. Supp. 1515, 1522 (M.D. Fla. 1996); *Atakpa*, 912 F. Supp. at 1575.  Courts have similarly found that damages are available in actions brought under Title II where the plaintiff shows intentional discrimination.[6]  *Badillo v. Ct. Adm'r Officer*, 2005 WL 1027176 at 5 (M.D. Fla. April 28, 2005); *Constance v. State Univ. of N.Y. Health Sci. Cent. at Syracuse*, 166 F. Supp. 2d 663, 667 (N.D.N.Y. 2001); *Matthews v. Jefferson*, 29 F. Supp. 2d 525, 535-36 (W.D. Ark. 1998).[7]

The Complaint specifically alleges that the Defendant's acts, "both of omission and commission, were intentional acts of discrimination . . . ."  (Doc. 1 at 7).  Thus the Court will

---

[6] This conclusion is logical given that the "rights, procedures, and enforcement remedies under Title II are the same as under section 504."  *Layton v. Elder*, 143 F.3d 469, 472 (8th Cir. 1998).

[7] *See also Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998) (no compensatory damages under Title II or Section 504 absent a showing of discriminatory intent); *Jeremy H. by Hunter v. Mount Lebanon Sch. Dist.*, 95 F.3d 272, 279 (3rd Cir. 1996) (monetary damages available under both Section 504 and Title II). Punitive damages, however, are not available in suits brought under Title II or the Rehabilitation Act.  *Barnes v. Gorman*, 536 U.S. 181, 189 (2002) ("Because punitive damages may not be awarded in private suits brought under Title VI of the 1964 Civil Rights Act, it follows that they may not be awarded in suits brought under § 202 of the ADA and § 504 of the Rehabilitation Act."); *see also Witbeck v. Embry-Riddle Aeronautical Univ., Inc.*, 269 F. Supp. 2d 1338, 1340 (M.D. Fla. 2003) (under Rehabilitation Act, plaintiff only entitled to compensatory damages).

examine whether the Plaintiffs have stated a claim for relief under the ADA and the Rehabilitation Act.

C. Title II of the ADA

Section 12132 of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such activity." 29 U.S.C. § 12132.  The regulations implemented to effectuate Title II specifically provide that:

> (a) A public entity shall take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others.
>
> (b)(1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity.

28 C.F.R. § 35.160.  To state a claim under Title II, a plaintiff must allege: "(1) that [she] is a 'qualified individual with a disability;' (2) that [she] was 'excluded from participation in or . . . denied the benefits of the services, programs, or activities of a public entity,' or otherwise 'discriminated [against] by such entity;' (3) 'by reason of such disability.'" *Shotz*, 256 F.3d at 1079 (quoting 42 U.S.C. § 12132); *see also Schiavo ex rel. Schindler v. Schiavo*, 358 F. Supp. 2d 1161, 1164 (M.D. Fla. 2005), *aff'd*, 403 F.3d 1289 (11th Cir. 2005).[8]  "Courts have found violations of . . . the ADA in cases where public accommodations, or public entities, failed to

_____

[8] The elements of a claim under the Rehabilitation Act are the same as a claim under the ADA, but with an added fourth element: "that the program or activity in question receives federal financial assistance." *Schiavo*, 358 F. Supp. 2d at 1164; see also *Badillo*, 2005 WL 1027176 at 5.

provide sign language interpreters." *Proctor v. Prince George's Hosp. Cent.*, 32 F. Supp. 2d 820,

827 (D. Md. 1998); *see also Rothschild v. Grottenthaler*, 907 F.2d 286, 289 (2nd Cir. 1990)

(school district's failure to provide services of sign language interpreter to deaf parents constituted

violation of Rehabilitation Act) .

      Connors alleges that she could not understand what the doctor said to the nurse during the

pelvic examination, she was unable to question the doctor about what he wrote, and she did not

have any idea how to treat her condition.  (Doc. 1 at 5).  Further, Rochette alleges that she could

not understand the treatment she received, she could not understand the consent forms she signed,

and did not understand what follow-up treatment was necessary for her injury.  (*Id*. at 5-6).  The

Complaint then alleges generally that the plaintiffs were unable to communicate with the

Defendant's employees, they did not understand to what they were consenting, they did not

understand what treatment was provided or what procedures were performed, they could not ask

questions or voice concerns, and their care was made more difficult and painful by their inability

to communicate.  (*Id*. at 6).  Thus, as to Connors and Rochette, these allegations are sufficient to

state a claim under the ADA.[9]  *See Proctor*, 32 F. Supp. 2d at 827; *Naiman v. N.Y. Univ.*, 1997

WL 249970 at 2 (S.D.N.Y. May 13, 1997) (plaintiff's claim that hospital's failure to provide

qualified sign language interpreter denied him the effective communication necessary to allow him

---

[9]  Because Connors and Rochette have stated a claim under the ADA, they have also stated a claim under the Rehabilitation Act.  "Cases decided under the Rehabilitation Act are precedent for cases under the ADA, and *vice-versa*." *Cash v. Smith*, 231 F.3d 1301, 1305 n.2 (11th Cir. 2000); *see also Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 n.3 (11th Cir. 2001) (claims brought under Rehabilitation Act and the ADA are evaluated under the same standards); *Sutton v. Lader*, 185 F.3d 1203, 1207 n.5 (11th Cir. 1999) ("The standard for determining liability under the Rehabilitation Act is the same as that under the ADA.").

to communicate with doctors and excluded him from participating in his medical treatment adequately stated a claim under the ADA and Rehabilitation Act).

D. Robert Connors

The allegations specifically made with regard to Robert Connors are that he went to the Defendant's emergency room with his wife, (Doc. 1 at 3), and that he "attempted to find out what was wrong with his wife, and additionally could not communicate with the doctors or staff of Defendant." (*Id*. at 5). However, starting at page 6 of the Complaint, the language changes from specific references to Connors, Robert Connors, and Rochette, to generic references to "Plaintiffs," yet the Complaint does not specifically define the term "Plaintiffs." This confusion is furthered by the fact that although the Complaint lists all three individuals as plaintiffs, much of the language refers to "the Plaintiffs' care," (Doc. 3 at 6), or "[t]he Plaintiffs sign[ing] the forms presented to them," (*Id*.), when according to the allegations of the Complaint, only Connors and Rochette actually received medical care from the Defendant. Thus, even if the Court were to interpret the term "Plaintiffs" in as expansive a manner as possible so as to include Robert Connors in that definition, it would lead to logical inconsistencies based on the allegations of the Complaint. Therefore it is not at all clear which allegations refer to only Connors and Rochette versus those allegations that refer to all three Plaintiffs (and thus to Robert Connors).

Furthermore, in contrast to the allegations specifically made with regard to Connors and Rochette, there are no allegations that Robert Connors requested an accommodation in the form of an interpreter or otherwise, such an accommodation was denied, or that he was discriminated

against because of his disability.[10]  Therefore, the Complaint fails to state a claim under the ADA and the Rehabilitation Act as to Robert Connors.[11]

## IV.      Conclusion

The Plaintiffs have failed to establish that they have standing to pursue injunctive relief, and thus the Complaint will be dismissed to the extent that it asserts claims for injunctive relief. The Complaint contains sufficient allegations to state a claim for damages under both Title II of the ADA and Section 504 of the Rehabilitation Act as to Connors and Rochette, but not as to Robert Connors, and thus the Complaint will be dismissed to the extent that it asserts a claim for damages as to Robert Connors.  Accordingly, it is

**ORDERED THAT** the Defendant's Motion to Dismiss (Doc. 9) is GRANTED to the extent discussed herein.  The dismissal of Robert Connors' claims will be without prejudice and with leave to amend.  The Plaintiffs shall have twenty days to replead in a manner consistent with this Order.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on June 23, 2005.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

---

[10] For example, the Complaint specifically alleges that both Connors and Rochette requested sign language interpreters, (Doc. 1 at 3, 4, 5), and that the Defendant failed to provide an interpreter for them during their care, (*Id*. at 2, 4, 5, 6).  There are no such corresponding allegations with regard to Robert Connors.

[11] The Plaintiffs should be prepared, upon re-pleading, to more clearly enunciate how the alleged conduct of the Defendant constituted "discrimination" against Robert Connors under the ADA, the Rehabilitation Act, and the Federal Regulations promulgated pursuant to each.

Copies furnished to:


Counsel of Record

Unrepresented Party