# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

JENNIFER CONNORS, ROBERT
CONNORS, DAWN BORQUE
ROCHETTE,

**Plaintiffs,**

-vs-                                           Case No.  6:05-cv-647-Orl-31KRS

WEST ORANGE HEALTHCARE
DISTRICT, d/b/a Health Central,

**Defendant.**
_____

# ORDER

In this case, the Plaintiffs assert that the Defendant discriminated against them by failing to

provide sign language interpreters during the course of the Plaintiffs' medical care.  By an Order

dated June 23, 2005, the Court dismissed the Plaintiffs' claim for injunctive relief.  (Doc. 17).  The

Plaintiffs subsequently filed an Amended Complaint (Doc. 19).  This matter is now before the

Court on the Defendant's Motion to Dismiss, (Doc. 20), and the Plaintiffs' Response thereto,

(Doc. 23).

I.      **Background**

A. The Parties

Jennifer Connors ("Connors") and her husband, Robert Connors, are residents of Ocoee,

Florida, and Dawn Borque Rochette ("Rochette") (collectively referred to along with Connors and

Robert Connors, where appropriate, as the "Plaintiffs") is a resident of Maitland, Florida.  The

Plaintiffs are profoundly deaf, and therefore are "qualified individuals" within the meaning of the

Americans with Disabilities Act, 42 U.S.C. section 12101, *et seq*. ("ADA") and section 504 of the

Rehabilitation Act, 29 U.S.C. section 794 ("Section 504" or the "Rehabilitation Act").  The

Plaintiffs communicate in American Sign Language.

The Defendant is an independent special district under Chapter 189 of the Florida Statutes,

and is considered a "public entity" within the meaning of 42 U.S.C. section 12131.

B. Facts

*1. Connors*

On July 14, 2004, Connors and her husband went to the Defendant's emergency room,

where Connors complained of vaginal bleeding.  (Doc. 19 at 5; Doc. 9 at 4).  Upon arrival,

Connors advised the Defendant's employee working at the registration desk that Connors needed a

sign language interpreter, and gave that employee a telephone number for an interpreting service.

(Doc. 19 at 5-6).  Connors also advised that employee that she had previously called the interpreter

to request that the interpreter meet her at the emergency room to assist her in communicating about

her medical condition.  (*Id*. at 6).  The Defendant's employee told Connors that she did not need an

interpreter, and that she would be able to communicate through writing.  (*Id*.).  Connors became

upset, and gave the Defendant's emergency room staff a copy of the Department of Justice

Guidelines for communicating in hospital settings with individuals that are deaf or hard of hearing.

(*Id*.).  The defendant's emergency room staff "laughed at [Connors] and Robert Conners and said

no."  (*Id*.).

Some time thereafter, the interpreter Connors had called arrived at the emergency room.

(*Id*.).  One of the Defendant's employees spoke with a supervisor, who advised Connors that she

would have to pay for her own interpreter.  (*Id*.).  Connors again referred to the Department of

Justice Guidelines, but the Defendant's employees gave the Guidelines back to Connors and demanded that the interpreter leave the hospital. (*Id.*). Connors was then brought to an examining room, where she again requested an interpreter. (*Id.*). The Defendant's employees ignored that request, and advised her that the doctor would use paper to communicate with her. (*Id.*). Another nurse then entered the examining room, and asked if Connors needed an interpreter. (*Id.*). Connors said that she did. (*Id.*).

Approximately one and one half hours later, a nurse entered the examining room and asked Connors for the Department of Justice Guidelines. (*Id.*). Three hours after that, the Defendant's employees returned the Guidelines to Connors, but did not treat her bleeding at that time. (*Id.*).

Subsequently, the Defendant's employees performed a pelvic examination on Connors, but did not communicate with her during that examination. (*Id.* at 7). Connors allowed the examination, despite the fact that she did not understand what was happening, because she felt it was an emergency. (*Id.*). During the examination, Connors was unable to understand what the doctor said to the nurse. (*Id.*). The doctor wrote the word, "endometriosis" on a piece of paper, and then left the examination room. (*Id.*). Connors did not know what that word meant, but was unable to question the doctor. (*Id.*). Approximately ten minutes later, a nurse came into the examination room, crossed out "endometriosis," and said that it was an error. (*Id.*). Connors "attempted to ask if her blood was normal, and the nurse said yes." (*Id.*). The nurse told Connors that she was "OK" despite the bleeding, and advised her to go home. (*Id.*). Connors was not told how to treat or handle the clotting and bleeding from which she was suffering. (*Id.*). Robert Connors also attempted to ascertain what was wrong with Connors, but he was unable to communicate with the Defendant's employees. (*Id.*).

-3-

*2. Robert Connors*

On June 14, 2005, Robert Connors presented himself at the Defendant's emergency room because he was suffering from severe abdominal pain. (Doc. 19 at 8). While in the emergency room, he requested an interpreter so that he could communicate with the Defendant's medical staff, but the Defendant's receptionist refused his request. (*Id*.). Robert Connors then attempted to exchange notes with the receptionist and a nurse about obtaining an interpreter. (*Id*.). He was unable to communicate effectively with the doctor because he could not properly explain his condition. (*Id*.). The doctor wrote the word, "Hernia" on a piece of paper, and also wrote the phone number of a surgeon on the Defendant's staff, Dr. Mazhar Nawaz ("Dr. Nawaz"). (*Id*.).

Jennifer Connors' mother then called Dr. Nawaz's office and explained that Robert Connors would need an interpreter for his June 17th appointment. (*Id*.). The receptionist refused that request, even after Jennifer Connors' mother explained about the ADA requirements. (*Id*.).

Robert Connors brought a hearing friend to his June 17th appointment. (*Id*.). His friend asked why an interpreter was not present. (*Id*.). Dr. Nawaz refused to provide an interpreter, and stated that if Robert Connors needed an interpreter, he should pay for one himself. (*Id*. at 9). It was difficult for Robert Connors to understand what happened at that appointment because his friend is not fluent in sign language and so it was difficult for the friend to interpret. (*Id*.). Robert Connors became upset and decided to find another surgeon. (*Id*.).

*3. Rochette*

Rochette visited the Defendant on November 6, 2004, because she had suffered a sprain of the large toe on her right foot. (Doc. 19 at 9). Upon admission, Rochette requested an interpreter because she cannot adequately understand complex written English. (*Id*.). The Defendant's

employees refused to provide Rochette with an interpreter.  (*Id*.).  As a result, Rochette was unable to understand the nature of the treatment she received, the medical consent forms she was given, or what follow-up treatment was required.  (*Id*.).

    *4. Common allegations*

    Because the Plaintiffs were unable to effectively communicate with the Defendant's employees, none of them understood the treatment provided or the procedures performed.  (Doc. 19 at 9-10).  The Plaintiffs were unable to ask questions or voice their concerns regarding the risks and benefits of the procedures and treatments recommended by the Defendant's employees.  (*Id*. at 10).

    In addition, the Plaintiffs were required to sign consent forms, as well as other forms, before they could receive medical treatment.  (*Id*.).  However, none of them had the assistance of an interpreter when reading and signing these forms, and although they signed the forms, none of them fully understood to what it was they were consenting or what treatment would be performed.[1] (*Id*.).  The Defendant's employees did not discuss the risks and benefits of the treatments, and as a result, the Plaintiffs were unable to weigh possible choices between procedures.  (*Id*.).  Instead, they signed the forms because they were afraid for their health and safety, and because they did not feel that they had any other options.  (*Id*.).

    C. Claims and Arguments

    In Count 1, the Plaintiffs assert that the Defendant violated Title II of the ADA, 42 U.S.C. section 12131, *et seq.* ("Title II"), by: (1) failing to maintain policies and procedures to ensure

---

    [1] In contrast to Rochette's allegations, neither of the Connors have alleged that they are unable to understand written English.

compliance with the ADA; (2) failing to ensure that communications with the Plaintiffs were as effective as communications with non-disabled patients; (3) failing to provide auxiliary aids and services; (4) failing to provide notice of the Plaintiffs' rights; and (5) excluding the Plaintiffs from, and denying them the benefits of, services due to their disability.  As a result, the Plaintiffs seek several remedies, including a declaratory judgment stating that the Defendant's polices and practices subjected the Plaintiffs to discrimination in violation of Title II, injunctive relief, and compensatory damages.

In Count 2, the Plaintiffs assert that the Defendant violated Section 504 of the Rehabilitation Act, in that the Defendant's policies and practices discriminated against the Plaintiffs on the basis of their disability, the Defendant denied the Plaintiffs services that were available to non-disabled individuals, and the Defendant refused to accommodate the Plaintiffs with appropriate auxiliary aids and services.  Thus, the Plaintiffs seek a declaratory judgment stating that the Defendant's practices and policies subjected the Plaintiffs to discrimination in violation of Section 504, injunctive relief, and compensatory and punitive damages.

The Defendant has moved to dismiss the claim for injunctive relief, arguing that the Plaintiffs are not entitled to injunctive relief under either the ADA or the Rehabilitation Act because they have failed to establish a sufficient likelihood of future injury.[2]

---

[2] Although the Defendant does assert that the Plaintiffs cannot establish that their alleged injury will be redressed by a favorable decision, the Defendant does so only in passing.  (See Doc. 20 at 7).  Other than that single sentence, the Defendant's motion focuses solely on the issue of future injury, and thus the Court will confine its analysis to that issue.

## II.      Standard of Review

In ruling on a motion to dismiss, this Court must view the complaint in the light most favorable to the Plaintiff, *Cannon v. Macon County*, 1 F.3d 1558, 1565 (11th Cir. 1993), and must limit its consideration to the pleadings and any exhibits attached thereto.  FED. R. CIV. P. 10(c); *see also GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993).  The Court will liberally construe the complaint's allegations in the Plaintiff's favor, *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969), and will not dismiss a complaint for failure to state a claim unless it appears beyond a doubt that the Plaintiff cannot prove any set of facts that support a claim for relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  In ruling on a motion to dismiss, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal."  *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In reviewing a complaint on a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), the rule to be applied is that, "courts must be mindful that the Federal Rules require only that the complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief."  *U.S. v. Baxter Intern., Inc.*, 345 F.3d 866, 880 (11th Cir. 2003) (*citing* FED. R. CIV. P. 8(a)).  This is a liberal pleading requirement, one that does not require a plaintiff to plead with particularity every element of a cause of action.  *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001).  Instead, the complaint need only "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  *Id.* (internal citation and quotation omitted).  "A complaint need not specify in detail the precise theory giving rise to recovery. All that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it

rests." *Sams v. United Food and Comm'l Workers Int'l Union*, 866 F.2d 1380, 1384 (11th Cir.

1989).

**III.     Legal Analysis - Standing to Seek Injunctive Relief**

There are three elements that make up the requirement of standing:

First, the plaintiff must have suffered an injury in fact - - an invasion of a legally
protected interest which is (a) concrete and particularized, and (b) actual or
imminent, not conjectural or hypothetical.  Second, there must be a causal
connection between the injury and the conduct complained of - - the injury has to
be fairly traceable to the challenged action of the defendant, and not the result of the
independent action of some third party not before the court.  Third, it must be
likely, as opposed to merely speculative, that the injury will be redressed by a
favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and quotations

omitted).  "The party invoking federal jurisdiction bears the burden of establishing these

elements." *Id*. at 561.  These elements are not mere pleading requirements; rather, they are "an

indispensable part of the plaintiff's case," and thus "each element must be supported in the same

way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and

degree of evidence required at the successive stages of the litigation." *Id*.  Thus, at the motion to

dismiss stage, "general factual allegations of injury resulting from the defendant's conduct may

suffice, for on a motion to dismiss [the Court] presume[s] that general allegations embrace those

specific facts that are necessary to support the claim." *Id*. (internal citation and quotation omitted);

*see also Miller v. King*, 384 F.3d 1248, 1263 n.14 (11th Cir. 2004) ("In ADA cases, [the Eleventh

Circuit] has held that a plaintiff lacks standing to seek injunctive relief unless he alleges facts

giving rise to an inference that he will suffer future disability discrimination by the defendant.").

Although normally actual injury can be addressed in the context of specific facts which have occurred in the past, injunctions regulate future conduct, so in order to have standing to seek injunctive relief, the plaintiff must allege facts showing a real and immediate - not just a hypothetical or conjectural - threat of a demonstrable future injury. *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) ("Allegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be 'certainly impending' to constitute injury in fact.") (internal citation and quotation omitted); *Koziara v. City of Casselberry*, 392 F.3d 1302, 1305 (11th Cir. 2004) ("An injury in fact cannot be an abstract injury."). Thus, in an ADA case, in order to achieve standing to pursue injunctive relief, a plaintiff must allege facts from which the court can infer that the plaintiff will suffer future discrimination by the defendant. *Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001); *Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1265 (11th Cir. 2001) ("to have standing to obtain forward-looking relief, a plaintiff must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future").

To support their standing to seek injunctive relief, the Plaintiffs allege that:

There is a real and immediate threat of future harm, and there is a likelihood that ROBERT CONNORS and JENNIFER CONNORS will be going back to Health Central, and it is also likely that Plaintiffs will suffer blatant discrimination at the hands of Health Central again; . . .

a. Health Central is five minutes from the CONNORS (sic) residence, as opposed to 45 minutes to go to and park at the next nearest hospital;

b. JENNIFER CONNORS suffers from Fibromyalgia and Migraine headaches, both of which are chronic and require medical attention;

c. JENNIFER CONNORS had a has serious injuries to her right shoulder from 15 years ago and it is painful for her to drive far

-9-

distance to another hospital in Orlando because she gets sick very easily and stressed if drives far distances for medical attention;

d. The CONNORS have four children and no babysitter, and if an emergency arises and it would be convenient for them to use Health Central[;]

e. The CONNORS' doctor for their children is on the third floor of Health Central[;]

f. The CONNOR (sic) children have had accidents like falls and needed to go to emergency room in the past, and like all small children, are likely to have falls in the future[;]

g. The CONNOR's (sic) fourth baby is teething and always puts objects in her mouth, and CONNOR (sic) constantly worries that she will be forced to go to another hospital far away and it will be too late to save their child's life over interpreter issue to explain what their child consumed and is choking on[;]

h. Both ROBERT CONNORS and JENNIFER CONNORS family doctor in Windermere refers them to specialists at Health Central for urology and other specialized consults. Health Central did not provide them an interpreter for these specialists when CONNORS asked them on the phone[;]

i. JENNIFER CONNORS was and is referred to Health Central for MRI and x-rays at Health Central[;]

j. JENNIFER CONNORS wanted to give birth at Health Central, but at the time they refused to agree to an interpreter being present at birth. She had no choice not to go there and gave birth at midwife birthing center and she had an interpreter for her at birth[;]

k. Health Central, in their newsletter, states that it may use hospital staff that know ASL as an interpreter, when, upon information and belief, such person is neither certified nor qualified to interpret American Sign Language.

l. Upon information and belief, if any of the CONNORS family had an accident and required an ambulance, the ambulance would take them to their closest hospital, Health Central.

(Doc. 19 at 3-4).

Clearly, several of these allegations are merely speculative and insufficient to support a claim for injunctive relief, particularly allegations (c), (f), and (g).  In its Motion, the Defendant addresses each of the Plaintiffs' standing allegations individually, and argues that none of the allegations is sufficiently particular to support standing for injunctive relief.[3]  At the motion to dismiss stage, however, the Court merely has to determine whether the allegations could embrace the specific facts required for relief, *Lujan*, 504 U.S. at 561, and thus the facts alleged must only give rise to an *inference* of future discrimination.  *Shotz*, 256 F.3d at 1081.  Thus, the Court will examine the Plaintiffs' allegations as a whole.

First, the Connors allege several incidents of past discrimination, including their primary allegations in the Complaint regarding their treatment during their respective visits to the Defendant's emergency room, as well as alleging that the Defendant refused to provide interpreters during their referrals to specialists and for the time Jennifer Connors sought to give birth at the Defendant's facility.  (Doc. 19 at 4).  Second, the Connors allege that they live within five minutes of the Defendant's facility, that the next closest hospital is forty-five minutes away, and that an ambulance would take them to the Defendant's facility in the event of an emergency.  (*Id*. at 3-4).[4]

---

[3] The Defendant also asserts that the fact that the Connors may have to bring their children to the Defendant's hospital does not give Jennifer or Robert Connors standing.  The Court does not need to decide this issue, as the allegations specific to Jennifer and Robert Connors suffice, at least at this stage, to provide them with standing.

[4] *See Gutherman v. 7-Eleven, Inc.*, 278 F. Supp. 2d 1374, 1378 (S.D. Fla. 2003) ("In order to demonstrate standing, a plaintiff must either live in close proximity to the defendant's facilities, or must demonstrate that he or she has visited the facility and/or is likely to visit in the near future."); *Access Now, Inc. v. S. Fla. Stadium Corp.*, 161 F. Supp. 2d 1357, 1365 (S.D. Fla. 2001) (history of past visits and continued residency in area supported plaintiff's contention that he would likely

Third, Jennifer Connors alleges that she suffers from chronic conditions that require medical attention,  she gets referred to the Defendant for MRIs and x-rays, and both of the Connors are referred to the Defendant to see certain specialists.  (*Id*. at 4).  Fourth, the Connors allege that the Defendant's staff are not qualified to act as sign language interpreters.  (*Id*.).  Finally, they specifically allege that they are likely to return to the Defendant's facility and will likely suffer discrimination when they do.  (*Id*. at 3).

Under the totality of the circumstances, the Court finds that the Connors' allegations are sufficient to allow the Court to infer a likelihood that the Connors will suffer future discrimination and injury.[5]  *See Gillespie v. Dimensions Health Corp.*, 369 F. Supp. 2d 636, 645 (D. Md. 2005) (plaintiffs had standing to seek injunctive relief where they alleged that: they had sought and would likely to continue to seek medical treatment from defendant; proximity of residence to defendant; and harm as a result of policy, pattern and practice of defendant); *Majocha v. Turner*, 166 F. Supp. 2d 316, 325 (W.D. Pa. 2001) (plaintiffs had standing where they averred that they would like to be treated by defendant, notwithstanding past incident of discrimination, for chronic infections which were likely to recur, but that they were prevented from doing so because defendant refused to alter procedures); *Dudley v. Hannaford Bros. Co.*, 146 F. Supp. 2d 82, 86 (D. Me. 2001) (plaintiff had standing based on single past incident of discrimination, allegation that discriminatory practices continued to exist, and that he would like to continue to patronize

---

patronize the defendant's facility in the future, and allegations sufficed to confer standing).

[5] There are no allegations, however, showing a likelihood of future harm to Rochette, and thus she does not have standing to pursue injunctive relief.  Thus, the Defendant's Motion will be granted as to Rochette.

defendant's establishment); *Parr v. L&L Drive-Inn Rest.*, 96 F. Supp. 2d 1065, 1079-80 (D. Haw. 2000) (plaintiff had standing based on past discrimination, allegation of intent to visit defendant's establishment in future, and defendant's establishment was located within reasonable distance from plaintiff's residence).[6]

## IV.    Conclusion

The Connors have alleged sufficient facts to withstand a motion to dismiss on the issue of standing to seek injunctive relief.  Rochette, however, has not.  Accordingly, it is:

**ORDERED THAT** the Defendant's Motion to Dismiss (Doc. 20) is GRANTED as to Rochette's claim for injunctive relief, and DENIED as to the Connors' claims for injunctive relief.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on August 15, 2005.


Copies furnished to:

Counsel of Record
Unrepresented Party

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

---

[6] The Court acknowledges that the issue of the Connors' standing is a close call.  Whether they will be able to continue to show standing by actually proving their allegations with facts at later stages of litigation remains to be seen.